UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| R. R., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>BLUE SHIELD OF CALIFORNIA,<br><br>    Defendant. | Case No. 3:22-cv-07707-JD<br><br>**ORDER RE SUMMARY JUDGMENT AND PROCEEDING PSEUDONYMOUSLY** |

Plaintiff R.R. was a participant in an employee welfare benefits plan issued to Fehr & Peers (the Plan), administered by California Physicians' Service dba Blue Shield of California (Blue Shield). Dkt. No. 1 ¶ 3; Dkt. No. 57 at 2. His son, E.R., was a covered dependent.[1] R.R. and E.R. allege that Blue Shield violated ERISA and the Plan's terms by declining to cover E.R.'s treatment at Innercept, a long-term residential treatment center. *See* 29 U.S.C. § 1001, *et seq*. Plaintiffs E.R. and R.R. seek approximately $225,000 in unreimbursed medical expenses. Dkt. No. 53 at 28.

The case was originally filed in the District of Utah, *see* Dkt. No. 1, and transferred to this District by joint stipulation of the parties, Dkt. No. 21. The parties agreed to dismiss plaintiffs' second cause of action, brought under the Mental Health Parity and Addiction Equity Act, 29 U.S.C. § 1132(a)(3). Dkt. No. 47. Plaintiffs have moved for summary judgment on the remaining count. Dkt. No. 53. Blue Shield filed a combined reply and cross-motion for summary judgment. Dkt. No. 57.

---

[1] Plaintiffs have not requested permission to proceed pseudonymously. The "use of fictitious names runs afoul of the public's common law right of access to judicial proceedings, and Rule 10(a)'s command that the title of every complaint 'include the names of all the parties.'" *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1076 (2000) (citations omitted); *see also Doe v. Beat*, No. 20-CV-06822-JD, 2022 WL 1157494 (N.D. Cal. Apr. 19, 2022). Plaintiffs are directed to file by September 6, 2024, a statement identifying themselves, or a request to proceed pseudonymously that complies with the governing standards.

**BACKGROUND**

The salient facts are undisputed. The Plan provides benefits for covered services deemed medically necessary, and reserves the right to review all claims for medical necessity. Dkt. No. 51-1 at AR 104. Blue Shield denied coverage for E.R. because it concluded residential treatment was not medically necessary under the Magellan Care Guidelines (MCG Guidelines). Blue Shield states that the MCG Guidelines are generally accepted standards of care, Dkt. No. 57 at 16, and plaintiffs do not dispute this representation.

Under the MCG Guidelines, 24/7 residential treatment is appropriate only if a patient meets one of the following criteria:

> (a) is a danger to self due to auditory hallucinations or persistent thoughts of suicide or serious self harm that cannot be monitored adequately at lower level of care;
> (b) is a danger to others due to auditory hallucinations or persistent thoughts of homicide or serious harm to others that cannot be monitored at lower level of care; or
> (c) has a behavioral health disorder with moderately severe psychiatric, behavioral, or other comorbid conditions . . . and a serious dysfunction in daily living.

Dkt. No. 50-8 at AR 1971, 1979. A patient experiences "serious dysfunction in daily living" only if he experiences a serious deterioration in interpersonal interactions, significant withdrawal and avoidance of almost all social interaction, consistent failure to achieve self-care as developmentally appropriate, serious disturbance in vegetative status, inability to perform adequately in school (including in a specialized setting) due to disruptive or aggressive behavior, severely diminished ability to assess consequences of own actions, or other evidence of serious dysfunction. *Id.* at AR 1983-83.

E.R. was sixteen years old at the time of his treatment at Innercept. He was adopted from South Korea by his parents in March 2004. Dkt. No. 53 at 3. His behavioral issues began at a young age: at 6, he exhibited "defiance" and noncompliance in educational settings. *Id.* at 4. In second grade, he was diagnosed with, and began receiving medication for, ADHD. *Id.* at 5. As he grew older, he became "more aggressive -- shouting and cursing at teachers and students" and "beginning to fight during recess." *Id.* (quoting Dkt. No. 50-7 at AR 1039). He started fires;

2

experienced sleep disturbances, agitation, and irritability; and developed an obsession with pornography. *Id.* at 6-7.

In February 2017, E.R. experienced a psychotic episode during a family trip to Lake Tahoe. Imagining he was under attack, E.R. "made fake Molotov Cocktails and collected projectiles such as knives and pens, which he was going to launch at intruders." *Id.* at 9 (quoting Dkt. No. 50-7 at AR 1041). In January 2018, E.R. was admitted to a psychiatric ward on a California Welfare and Institutions Code Section 5150 hold after he "threatened to burn the house down," "barricaded himself in his room," and "cut himself on glass from a picture frame he had broken." *Id.* at 11 (quoting Dkt. No. 50-7 at AR 1042). In March 2018, E.R. was placed on another 5150 hold after he again barricaded himself in his bedroom with a block of kitchen knives, requiring intervention by a police SWAT team and a negotiator. Dkt. No. 53 (quoting Dkt. No. 50-7 at AR 1042-43). In the summer of 2018, E.R. smashed his mother's computer and physically prevented her from leaving their home by holding "on to her arms, causing bruising, and t[earing] her blouse." *Id.* (quoting Dkt. No. 50-7 at AR 1043). Throughout this time, E.R. also experienced hallucinations. *Id.* at 10, 13.

In January 2020, E.R. was placed on a third 5150 hold after threatening his therapist with physical violence. Dkt. No. 53 at 15 (quoting Dkt. No. 50-7 at AR 1044-45). He was admitted to Contra Costa Regional Medical Center, then moved to John Muir Health, and discharged in January 2020. He was subsequently admitted to Innercept, a 24/7 residential treatment facility, on February 13, 2020. Dkt. No. 53 at 15.

Plaintiffs tendered a coverage demand for E.R.'s treatment at Innercept on February 13, 2020. Dkt. No. 50-3 at AR 283. Blue Shield denied coverage as not medically necessary and recommended a lower level of care for E.R., including a partial hospitalization program (PHP). Dkt. No. 50-8 at AR 1944. Plaintiffs appealed Blue Shield's denial in May 2020. Dkt. No. 50-7 at AR 1034. Blue Shield denied plaintiffs' appeal, again determining E.R.'s treatment at Innercept was not medically necessary. Dkt. No. 50-5 at AR 889. E.R. was ultimately discharged from Innercept in May 2021, and admitted to a PHP. Dkt. No. 53 at 57.

3

**DISCUSSION**

**I.   LEGAL STANDARDS**

Under ERISA, a participant in an employee benefit plan may bring a civil action to recover benefits claimed to be due.  29 U.S.C. § 1132(a)(1)(B).  "In the ERISA context, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  *Hall v. AT&T Umbrella Benefit Plan No. 3*, No. 20-CV-07076-JD, 2022 WL 2276897, at *2 (N.D. Cal. June 23, 2022), *appeal dismissed sub nom. Hall v. AT&T Umbrella Benefit Plan No. 1*, No. 22-16107, 2022 WL 18430530 (9th Cir. Nov. 29, 2022) (internal quotations omitted).  A *de novo* standard of review will apply to actions for the recovery of ERISA benefits, unless the plan in question grants discretionary authority to the trustee or fiduciary.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114-15 (1989).  If a plan unambiguously grants the plan administrator discretionary authority to construe the plan's terms, the appropriate standard of review is for abuse of discretion.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  "Under this deferential standard, a plan administrator's decision 'will not be disturbed if reasonable.'"  *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (quoting *Conkright v. Frommert*, 559 U.S. 506 (2010)).  A decision will be overturned only if the "application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'"  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)).

The Plan gives Blue Shield discretionary authority to "construe and interpret the provisions of this Plan," including determining eligibility and benefits.  Dkt. No. 51-1 at AR 94.  Plaintiffs suggest the plan administrator's determination should be receive *de novo* review, citing Section 10110.6 of the California Insurance Code, which renders unenforceable any provisions of "life insurance or disability insurance" policies for California residents that reserve "discretionary authority to the insurer . . . to determine eligibility for benefits or coverage."  Dkt. No. 53 at 30 (quoting Cal. Ins. Code § 10110.6).  But Section 10110.6 does not apply to managed health care

4

plans like the plan at issue here, which are governed instead by the Knox-Keene Act. *See* Cal. Health & Saf. Code § 1345(f)(1); *see also Delta Dental Plan of California, Inc. v. Mendoza*, 139 F.3d 1289, 1291 (9th Cir. 1998) (Knox-Keene Act governs managed health care plans). The California Insurance Code exempts "health care service plans" from its purview, and they are subject to the jurisdiction of the Commissioner of Corporations under the Knox-Keene Act. *See* Cal. Ins. Code § 740(g); Cal. Health & Saf. Code § 1340 *et seq.*; *Williams v. California Phys. Serv.*, 72 Cal. App. 4th 722, 728-30 (1999) (health care service plans not subject to the California Insurance Code). Consequently, the abuse of discretion standard applies.[2] *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

## II. EXHAUSTION

An ERISA plaintiff claiming a denial of benefits "must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court." *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008) (quoting *Diaz v. United Agric. Emp. Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995)). The exhaustion requirement operates to ensure that there is an adequate administrative record prior to litigation. *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980). Exhaustion is a "prudential rather than jurisdictional requirement," and the Court has discretion to determine whether to require an ERISA claimant to exhaust administrative remedies. *Mack v. Kuckenmeister*, 619 F.3d 1010, 1020 (9th Cir. 2010).

Plaintiffs seek review of Blue Shield's denial of coverage for E.R.'s treatment at Innercept from February 13, 2020, to May 4, 2021. Dkt. No. 53 ¶ 5. Blue Shield says plaintiffs have exhausted only the claims regarding Blue Shield's denial of coverage from February 13, 2020,

---

[2] Neither party contends that Blue Shield acted in a dual role as the administrator of claims and the insurer who pays the benefits. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 112-13 (2008); *see Puccio v. Standard Ins. Co.*, 80 F. Supp. 3d 1034, 1040 (N.D. Cal. 2015). There is a built-in conflict of interest if the same entity that makes the eligibility decision also pays the benefits. *Id.* at 112 (describing conflict as "'every dollar saved . . . is a dollar in [the employer's] pocket'") (citation omitted); *Montour v. Hartford Life & Accident Ins. Co.,* 588 F.3d 623, 630 (9th Cir. 2009) (same). Because the parties did not raise the question of a potential conflict, the abuse of discretion standard applies.

5

through May 8, 2020, but not from May 9, 2020, onwards. Dkt. No. 57 at 33-34.

The administrative record is rather ambiguous on this point. Blue Shield's initial denial stated that the request for coverage was "[n]ot approved from 02/13/2020 forward," with no exact end date. Dkt. No. 50-8 at AR 1944. When plaintiffs appealed Blue Shield's denial of coverage for E.R.'s treatment at Innercept, they sought to appeal the denial from February 13, 2020, "through his future date of discharge." Dkt. No. 50-7 at AR 1034. In the final denial of coverage, Blue Shield appears to have construed plaintiffs' claim for denial of coverage as dating from February 13, 2020, to May 8, 2020, Dkt. No. 57 at 33, and denied coverage "from February 13, 2020 through May 7, 2020, with discharge on May 8, 2020." Dkt. No. 50-5 at AR 889. The final administrative denial did not address coverage of E.R.'s treatment from May 9, 2020, to May 4, 2021.

None of the records in plaintiffs' files indicated that E.R. would be discharged on May 8, 2020, or that they intended to limit their appeal of Blue Shield's denial to February 13, 2020, through May 8, 2020. Blue Shield's initial denial, and the text of plaintiffs' appeal, expressly addressed the denial of coverage through discharge. Plaintiffs submitted Innercept treatment records indicating E.R.'s anticipated discharge would occur in Spring 2021. *See* Dkt. No. 50-7 at AR 1588, 1594.

Additionally, although Blue Shield asserts that a "participant cannot . . . appeal claim determinations that have not been made and, in this case, claims for daily services nearly a year into the future," Dkt. No. 57 at 33, the procedures it cites do not squarely fit the circumstances here. *See* Dkt. No. 51-1 at AR 95-97, 227-229. Blue Shield denied E.R.'s treatment coverage at Innercept on the grounds that the treatment was not medically necessary. Dkt. No. 2 ¶ 52. This determination applied uniformly to the entirety of E.R.'s treatment at Innercept. Nothing in E.R.'s circumstances suggested that Blue Shield's reasons for denial might have changed between May 9, 2020, and May 4, 2021. Consequently, Blue Shield's procedures do not indicate plaintiffs' appeal "through [E.R.'s] future date of discharge" was somehow improper or premature. Dkt. No. 50-7 at AR 1034. In light of the plain text of Blue Shield's initial denial, and the record as a whole, the Court will take up plaintiffs' claim regarding Blue Shield's denial from February 13, 2020,

through E.R.'s discharge on May 4, 2021.

## III. ADMINISTRATIVE RECORD

Plaintiffs urge the Court to disregard any arguments, record citations, and evidence not articulated to the plaintiffs during the administrative process, suggesting that Blue Shield had not "specifically cite[d] to any of E.R.'s medical records, respond to the opinions of his treating clinicians, . . . [and] did not cite to any specific dates or incidents in E.R.'s medical records that it contended support its decision to deny his claims." Dkt. No. 58 at 6. When denying a claim, an ERISA plan administrator must provide "specific reasons for such denial" and provide a "full and fair review." 29 U.S.C. § 1133. The administrator must also provide the specific plan provisions on which the denial is based. 29 C.F.R. § 2560.503-1(g). An ERISA plan administrator may not "assert a reason for denial of benefits that it had not given during the administrative process." *Harlick v. Blue Shield of California*, 686 F.3d 699, 719-20 (9th Cir. 2012).

*Harlick* is inapposite. *See Harlick*, 686 F.3d at 719 (foreclosing new reasons, but not new evidence, on appeal). Marshalling additional evidence to bolster an existing reason is different from offering new reasons. Our circuit has indicated as much. *See Beach v. Liberty Life Assur. Co. of Bos.*, 763 F. App'x 601, 602 (9th Cir. 2019) (unpublished) (distinguishing "new factual arguments," which were permissible, from a "new reason prohibited by *Harlick*"). Blue Shield based the denial of coverage on medical necessity grounds, and relied on the same guidelines throughout the administrative process. *See* Dkt. No. 50-8 at AR 1944-45 (citing the MCG Guidelines and the Plan's Medical Necessity provisions); Dkt. No. 50-5 at 889-925 (offering same reasons); Dkt. No. 57 at 4 (describing Medical Necessity exclusions), 8 (MCG guidelines). Although Blue Shield's initial denial was quite concise, it articulated a basis for denial that has remained consistent. Consequently, Blue Shield's citations to the record are permissible, and will not be disregarded.

## IV. THE MERITS

There is no doubt that E.R. has a serious psychiatric condition and has suffered substantially from it, as has his family. Even so, for the salient question in this case, namely whether Blue Shield should have paid for the residential care at Innercept, the record establishes

7

that Blue Shield did not abuse its discretion in denying plaintiffs' claim.  Overall, plaintiffs did not demonstrate that the denial was "illogical, implausible, and without support in inferences that could be reasonably drawn from the facts in the record." *Salomaa*, 642 F.3d at 676.  They also did not show that the decision went against the opinions of the treating physicians, was largely unsupported by the medical file, or that Blue Shield did not engage in a "meaningful dialogue" about the denial.  *Id.*; *see also Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 905-06 (9th Cir. 2016) (failure to "explain[] specifically" their bases for rejecting claims in light of corroborating evidence supported inference of abuse of discretion).

To unpack this overall conclusion, plaintiffs seek summary judgment on two grounds.  First, they say Blue Shield's denial letters did not adhere to ERISA's procedural requirements.  Second, they say Blue Shield's denials were substantively incorrect, and that the record demonstrates E.R.'s treatment at Innercept was medically necessary.  *See* Dkt. No. 53 at 31, 36.

Procedural violations alone generally do not establish an abuse of discretion.  *See Abatie*, 458 F.3d at 974.  An initial denial must state the "specific reason or reasons for the adverse determination," "the specific plan provisions on which the determination is based," and "any additional material or information necessary . . . to perfect the claim."  29 C.F.R. § 2560.503-1(g)(1).  A denial based on lack of medical necessity must additionally include "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."  28 C.F.R. § 2560.503-1(g)(1)(v)(B).  On appeal, the review must take into account "all comments, documents, records, and other information submitted."  29 C.F.R. § 2560.503-1(h)(2)(iv).  For group health plans, an appeal review must include a review from "a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment" who was not "consulted in connection with the adverse benefit determination that is the subject of the appeal."  29 C.F.R. § 2560.503-1(h)(3).

The initial and final denial letters by Blue Shield comported with ERISA's procedures.  Dr. Badr Javed's initial denial specified that it reviewed E.R.'s treatment to ensure it was "medically necessary and appropriate," and that the MCG guidelines were applied.  Dkt. No. 50-9 at AR 1944-45.  Dr. Javed's applied the guidelines and noted that E.R. did not want to harm

8

himself or others, had on occasion "showed better behavior," and did "not need around-the-clock care," and also explained the clinical judgment supporting the medical necessity determination. *Id.* at AR 1944. The final denial stated that it was based on a "review of your medical records submitted to Blue Shield," and incorporated the "comments, documents, records, and other information submitted," to conclude E.R.'s treatment was not medically necessary. Dkt. No. 50-5 at AR 889. The denial included a review by an independent physician, as required, who similarly concluded that E.R. did not meet the MCG guidelines for residential treatment, determining that E.R. did not appear to be a danger to himself or others, and there "was no indication of the patient had [sic] any symptoms suggestive of command hallucinations, persecutory delusions, or severe paranoia." *Id.* at AR 890.

Plaintiffs turn to an out-of-circuit decision to contend that plan administrators must substantively engage with treating physician opinions in denial letters. Dkt. No. 53 at 32 (citing *D.K. v. United Behavioral Health*, 67 F.4th 1224 (10th Cir. 2023)). But the Tenth Circuit's reasoning in *D.K.* has not been adopted by the Ninth Circuit, and arguably conflicts with the Supreme Court's conclusion that "ERISA does not support judicial imposition of a treating physician rule" which would "require[] a hearing officer to explain why she rejected the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 n.4 (2003). Consequently, the Court declines to impose such a requirement here.

On the substance of Blue Shield's denials, the determinations of medical necessity are not plainly illogical or without support in the record. During the 5150 hold that precipitated E.R.'s admission to Innercept, an intake evaluation noted that E.R. "denies SI/HI [suicidal intent/homicidal intent] or AH/VH [auditory hallucinations/visual hallucinations]." Dkt. No. 50-7 at AR 1469. It stated that E.R. "feels confident that he would never actually harm anyone. He explains some of his behavior in the past quite openly and admits it was to emotionally hurt his parents, says he was going 0 to 100 but then goes down to a 15 and feels very badly. He wants to continue to work on coping better with stress." *Id.* E.R. was rated as a "low" risk of danger to himself, a "moderate" risk of danger to others, and a "low" risk of grave disability. *Id.* at AR 1472. His initial assessment at Innercept similarly stated that he was at "minimal" risk of danger

to himself and others, Dkt. No. 50-8 at AR 1701, an assessment that persisted throughout his treatment at Innercept. *See, e.g.*, *id.* at AR 1661 (February 25, 2020), AR 1660 (March 9, 2020), AR 1653 (March 14, 2020), AR 1639 (March 25, 2020). Although E.R. experienced hallucinations, including a "shadow person," those hallucinations did "not feel threatening." *Id.* at AR 1702.

The MCG guidelines deem residential treatment medically necessary if the patient poses a danger to self or others, or a behavioral health disorder is present along with "moderately severe psychiatric, behavioral, or other comorbid conditions" and "serious dysfunction in daily living." *Id.* at AR 1971 (cleaned up). There is adequate record evidence indicating that although E.R. might have experienced intense emotional volatility, including some moderate risk of danger to others, he did not experience "persistent thoughts of homicide or serious harm to another," or "persistent thoughts of suicide or serious harm to self." *Id.* at AR 1979 (cleaned up). And although his past experiences might reflect a struggle to "perform adequately in school" or avoid "impulsive or abusive behaviors" in interpersonal settings, *id.* at AR 1991, his records at Innercept present a mixed picture. *See, e.g.*, *id.* at AR 1658 (noting that E.R. "has developed about five friendships," "struggles to stay engaged in the program" but is "becoming gradually more integrated"). Based on the MCG guidelines for residential care and E.R.'s records, the Court cannot say Blue Shield abused its discretion.

To be sure, some documents in the record indicate stronger concerns about E.R. During the January 2020 5150 hold, a treating physician expressed "acute safety concerns" in light of E.R.'s recent bouts of aggression "at home with a sledgehammer" and a "constellation of decompensating mood, anger, mood lability." Dkt. No. 50-7 at AR 1479. His treating professionals -- including a psychiatrist, education consultant, pediatric psychiatrist, and a psychologist -- recommended that E.R. enter long-term treatment in a residential facility. *Id.* at AR 1047-51. In the weeks leading up to the 5150 hold and his treatment at Innercept, E.R.'s psychologist noted E.R. had exhibited a "significant increase in his aggressive behaviors that could not be managed safely outpatient any further." *Id.* at AR 1051. At Innercept, E.R. shared with a medical provider that he "experienced 'five personas that I put in boxes.' . . . [E.R.] said

10

that once he put them in boxes, 'They never got out but it took up 85% of my energy to keep them there and I got really tired.' . . . He denied that they ask him to hurt himself or others." Dkt. No. 50-8 at AR 1701.

Even so, these findings do not expressly conflict with Blue Shield's conclusion that residential treatment was not medically necessary under the MCG Guidelines. Blue Shield's reviewers concluded that E.R. was not at "persistent high risk of harm to self or others" -- not that he posed no risk of harm at all. Blue Shield's reviewers concluded that although E.R. experienced "paranoia and delusional thoughts," he did not experience "command hallucinations, persecutory delusions, or severe paranoia," which is supported by the record. Dkt. No. 50-5 at AR 890. Finally, although his treating professionals all recommended residential treatment, their letters of medical necessity did not expressly state, or otherwise imply, that he was at a high risk of harm to others or himself, that he experienced a severe dysfunction in daily living, or that he met any of the specific factors laid out in the MCG Guidelines for residential treatment. Dkt. No. 50-7 at AR 1047-51.

The Court is sympathetic to the challenges E.R. and his family have faced. The record before the Court reflects a years-long struggle to obtain effective treatment for E.R.'s condition, and E.R.'s parents' advocacy and resilience on their son's behalf is admirable. But based on an extensive review of the administrative record, the Court cannot say that Blue Shield abused its discretion in denying coverage of E.R.'s treatment at Innercept.

## CONCLUSION

Plaintiffs will file by September 6, 2024, a statement identifying themselves, or a request to proceed pseudonymously that complies with the governing standards. Blue Shield's motion for summary judgment is granted, and plaintiffs' motion is denied. Judgment will be entered separately and after the use of pseudonyms is determined.

**IT IS SO ORDERED.**

Dated: August 8, 2024

JAMES DONATO
United States District Judge

11